## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **ANDREW WEISNER,** | * | |
| **Plaintiff** | * | |
| **v.** | * | **CIVIL NO. JKB-15-2545** |
| **LIBERTY LIFE ASSURANCE COMPANY OF BOSTON,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## <u>MEMORANDUM</u>

Andrew Weisner ("Plaintiff") brought an action against Liberty Life Assurance Company of Boston ("Defendant"), pursuant to section 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA") of 1974, as amended, 29 U.S.C. § 1132(a)(1)(B), seeking to recover long-term disability ("LTD") benefits.  Now pending before the Court are cross-motions for summary judgment filed by Defendant (ECF No. 14) and Plaintiff (ECF No. 19).  The issues have been briefed (*see* ECF Nos. 14–1, 19–1, 22 & 23), and no hearing is necessary to resolve these motions, *see* Local Rule 105.6 (D. Md. 2014).  For the reasons explained below, both motions will be DENIED, and this case will proceed to a bench trial on the administrative record.

## I.     *Factual Overview*[1]

Plaintiff was formerly employed as an auditor (Analyst, Quality Assurance II) for CareFirst BlueCross BlueShield d/b/a CareFirst, Inc. ("CareFirst") (*see* ECF No. 1 ¶ 7).  As a

---

[1] At the summary-judgment stage, the facts and inferences to be drawn therefrom are taken in the light most favorable to the nonmovant.  *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).  Because both parties here have moved for summary judgment, the Court has considered each motion on its own merits "to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir.1997)).  Having done so, the Court has concluded that this case is not amenable to summary judgment.  Accordingly, the Court presents the uncontested facts (here and elsewhere in the Memorandum) and flags critical points of dispute.

CareFirst employee, Plaintiff was covered by an LTD insurance policy issued by Defendant in September 2012 (#GF3-830-510057-01) (the "Policy").  The parties here agree that the Policy is an employee welfare benefit plan governed by ERISA.  *See* 29 U.S.C. § 1002(1).  The Policy's operative language provides as follows:

> When [Defendant] receives Proof that a Covered Person is Disabled due to Injury or Sickness and requires the Regular Attendance of a Physician, [Defendant] will pay the Covered Person a Monthly Benefit after the end of the Elimination Period, subject to any other provisions of this policy.  The benefit will be paid for the period of Disability if the Covered Person gives to [Defendant] Proof of continued:   1. Disability; 2. Regular Attendance of a Physician; and 3. Appropriate Available Treatment.

(LL000023.[2])  A covered person is "Disabled" within the meaning of the Policy if, during the elimination period (equal to the greater of 180 days or the end of short-term disability coverage) and for twenty-four months thereafter, the person, "as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation" and, after that initial period, is "unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation."  (LL00010.)   The Policy defines "Own Occupation" as the covered person's "employment, business, trade or profession" involving duties of the same general character as those he was performing when his disability began:  "Own Occupation" is not limited to the person's former job with his employer.   (LL000014.)   The Policy further defines "Any Occupation" as any occupation for which the covered person "is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity."  (LL000009.)  Additionally, the Policy defines "Material and Substantial Duties" as those tasks normally required to perform the relevant occupation, provided the tasks "cannot be reasonably eliminated or modified." (LL000013.)

---

[2] Throughout this Memorandum, the Court cites the administrative record, which Defendant submitted as a lengthy paper exhibit (*see* ECF No. 14–3), using the record's Bates labeling system.

In his capacity as a CareFirst auditor, Plaintiff reviewed credentialing,[3] recredentialing, and demographic-update tasks performed by credentialing specialists to ensure that their work product was accurate; he also monitored incoming telephone inquiries, identified procedural/system/training issues based on his audit findings, and served as a subject-matter expert and coach for credentialing personnel. (LL000340–41.)  The position required such skills as judgment and decision making; effective communication and advocacy; strong technical expertise; project management; and the ability to "effectively work in a fast paced environment with frequently changing priorities, deadlines, and workloads." (LL000341–42.)

Plaintiff enjoyed his auditing work at CareFirst, describing it as his "dream job." (LL000239.)  He claims that he had a "reputation for near perfect accuracy" during his first decade of employment (*id.*); his final evaluation for calendar-year 2012 reflected that he consistently met or high-met expectations (*see* LL000433–38).  Yet for calendar-year 2013, Plaintiff's performance plummeted:  he failed six out of twelve audits (LL000239), and his evaluation scores reflected that he needed improvement across most categories (*see* LL000439–45).  Plaintiff received his negative evaluation on January 14, 2014; he never returned to work after that date.  Instead, on January 15, he submitted a disability claim, citing "neck and back pain, memory loss and confusion, headaches, and depression" (LL000394).

Plaintiff was approved for short-term disability benefits:  pursuant to the elimination period as specified in the Policy, the earliest date on which he could qualify for LTD benefits was July 14, 2014.  During the interim (and continuing well into 2015), Plaintiff completed a series of psychiatric, neuropsychological, and neurological examinations in an effort to pinpoint

---

[3] "Credentialing is the initial ongoing collection, verification and review of evidence that a health care professional is qualified to practice his or her licensed profession."  Ruth A. Mickelsen, *Managed Care Credentialing and Provider Selection* (Am. Health Lawyers Ass'n, 1994), AHLA-PAPERS P12059405 (Westlaw).  Credentialing decisions regulate practitioners' access to, as relevant here, insurance networks.

the source of his symptoms.   On January 13, 2014, Plaintiff met with Dr. Kevin Crutchfield, a neurologist at the Sandra and Malcolm Berman Brain & Spine Institute (the "Berman Institute"): Plaintiff informed Dr. Crutchfield that he had experienced concussions in the past ("too many to count") and suffered from almost daily headaches.  (LL000193.)  Dr. Crutchfield diagnosed Plaintiff with concussion, cervicalgia, abnormal coordination, saccadic eye movement deficiency, photophobia, headache, and "[d]epression, severe with anxiety without suicidal ideation."  (LL000196.)[4]  Noting that most of Plaintiff's "cognitive and attention difficulties could be explained by his depression," Dr. Crutchfield referred Plaintiff to a neuropsychiatrist at Sheppard Pratt.  That neuropsychiatrist, Dr. Margo Lauterbach, worked with Plaintiff throughout the period during which his LTD claim remained pending.  Her progress notes reflect Plaintiff's continual complaints about depression, anxiety, and headaches; her notes also reflect Plaintiff's admission that he used cannabis products frequently (against medical advice) and that he was "not interested in developing coping skills or other therapeutic interventions" as he does not "like counseling" (LL000129; *see generally* LL000120–52).   Dr. Lauterbach initially diagnosed Plaintiff with "Mood Disorder NOS" and "Cannabis Abuse" (LL000144); she later upgraded these diagnoses to "Other specified bipolar and related disorder" and "Cannabis use disorder, Severe" (LL000131).

On March 31, 2014, Plaintiff was seen by Dennis Rivenburgh, PA, an associate of Dr. Crutchfield's:  Plaintiff informed PA Rivenburgh that he had suffered a head injury on February 22 that he attributed to a concussion, and he complained about his daily headaches and a worsening tremor.  (LL000188–92.)  PA Rivenburgh referred Plaintiff to Dr. Ivica Ducic of the

---

[4] Plaintiff has been diagnosed repeatedly with other, potentially related conditions such as obesity, hyperlipidemia, and obstructive sleep apnea.  However, because his LTD claim primarily relates to his neurological and cognitive complaints, and because it appears from the record that Plaintiff's other conditions predated his decline in work performance, the Court focuses (as the parties have done) on those neurological and cognitive concerns.

Plastic Surgery, Nerve & Headache Institute; Dr. Ducic reported that exam results "objectively confirmed" occipital neuritis/neuralgia and "significant tenderness over involved nerves," and he added that Plaintiff may have suffered a direct nerve injury due to head trauma as well as a "traction stretch injury" due to hyperflexion neck trauma.   (LL000113.)[5]   Dr. Ducic recommended occipital nerve surgery, though there is no indication in the record that Plaintiff thereafter underwent any such procedure.  However, Plaintiff did receive occipital nerve blocks (*i.e.*, steroid injections) during the summer of 2014 and again that winter:  there is some indication that these injections alleviated Plaintiff's pain, although the results were mixed.  (*See* LL000173–82, 467, 486–88, 575–78, 601–02, 615–18.)

While Plaintiff was undergoing these psychiatric and neurological exams, he also underwent testing for cognitive and behavioral deficits.  On April 17, 2014, Plaintiff had a neuropsychological consultation with Dr. S. Marc Testa at the Berman Institute.  Dr. Testa found that Plaintiff's intellect was above average but that his processing speed was "slower than expected and significantly weaker than his other intellectual abilities."  (LL000160.)  Plaintiff's word-list learning and memory functions were "notable for lower than expected," though his free recall was "excellent" and his nonverbal memory was "intact."  (*Id.*)  Behaviorally (pursuant to a personality assessment inventory), Plaintiff appeared "likely to be plagued by worry and negative expectations to the degree that his ability to concentrate and attention are significantly compromised."  (LL000161.)  Dr. Testa diagnosed Plaintiff with generalized anxiety disorder (and with bipolar affective disorder as a "remote diagnostic possibility").  (LL000162.) Interestingly, Dr. Testa opined that Plaintiff's cognitive weaknesses are "*not* consistent with the

---

[5] Plaintiff received a similar diagnosis from Dr. Vajira Gunawardane of the Maryland Pain & Spine Center.  Dr. Gunawardane noted tenderness over Plaintiff's occipital nerves and pain in his cervical spine and reported that Plaintiff likely suffered a direct nerve injury during one of his falls.  (LL000611–12.)  Dr. Gunawardane also reviewed an MRI of Plaintiff's cervical spine, noting herniation at C5/6 and C6/7 and an extrusion at C7/T1, but he deemed these findings "asymptomatic."  (LL000617.)

cognitive profile described among individuals with multiple concussions" but are instead "likely due to elevated symptoms of anxiety, a tendency to focus on problems that he may not be able to control, and depressive symptoms." (*Id.*)

Defendant reviewed the above-described medical records in connection with its investigation of Plaintiff's LTD claim. (*See* LL000388.) Defendant also referred Plaintiff's records for peer review by two independent, board-certified practitioners: a neuropsychologist (Dr. Timothy McManus) and a psychiatrist (Dr. Peter Sugerman). Drs. McManus and Sugerman issued a joint report on September 19, 2014, in which they opined that Plaintiff was *not* disabled within the meaning of the Policy.

Dr. McManus observed that the record contained no documentation that Plaintiff had experienced the number of concussions he claimed or that he sought medical attention in connection with his alleged February 22, 2014, concussion. (LL000285.) Dr. McManus also found "insufficient support for the presence of any psychological or neuropsychological [*sic*] that is causing any cognitive impairment that would preclude [Plaintiff] from performing the material duties of his occupation." (*Id.*) With respect to Dr. Testa's findings, Dr. McManus suggested that Plaintiff's personality assessment inventory, in particular, showed a "negative bias in reporting symptoms" that is "consistent with either exaggeration of symptoms or non-credible symptom reporting." (LL000286.) He added that Plaintiff's reduced processing speed could be regarded as "potentially consistent with his cannabis abuse" but does "not indicate the presence of any functional impairment." (LL000287.)

Dr. Sugerman shared Dr. McManus's opinion about Plaintiff's cannabis use, writing that Plaintiff's behavior "supports overuse of this illicit substance and an inability to stop"; however,

Dr. Sugerman considered the disorder "mild." (LL000288.)[6] He added that impairment related to marijuana use is not supported, as the "temporary effects of this substance that might impact functioning is [*sic*] a result of [Plaintiff's] choice of action rather than an illness he cannot control." (LL000289.) Dr. Sugerman also suggested that Plaintiff's records support an unspecified depressive disorder but that Dr. Lauterbach's mood-disorder and bipolar diagnoses are not well-established. (LLL000288.) He denied psychiatric or social impairment. (LL000289–90.)

Drawing almost exclusively from the McManus/Sugerman report, Defendant denied Plaintiff's LTD claim on September 24, 2014. (*See* LL000387–91.) Thereafter, on May 7, 2015, Plaintiff (by counsel) filed a notice of administrative appeal. (*See* LL000407–17.) In connection with his appeal, Plaintiff supplemented the administrative record with additional documents, including (1) a November 2014 report by Dr. William Keys, a board-certified neurologist, finding MRI and physical evidence of early multiple system atrophy and a related movement disorder (LL000598–602); (2) a March 2015 "Disability Work Assessment" by Manish Singh of Physiotherapy Associates, opining that Plaintiff "would not be likely to sustain an 8-hour workday or 40-hour workweek due to de-conditioning[] and decreased fine motor and manipulation skills" (LL000446–52); and (3) an April 2015 report by Martin Kranitz, a vocational consultant who reviewed Plaintiff's files and concluded that Plaintiff "would be precluded not only from his previous employment but any other employment." (LL000454–62.) Defendant also supplemented the record, securing additional peer reviews by Dr. Bogdan Davidescu (a pain specialist) and Dr. Leanne Burnett (a neurologist). Dr. Davidescu opined that "no impairment is supported due to occipital neuralgia" and that there is "insufficient data

---

[6] Dr. Sugerman's evaluation differs from Dr. Lauterbach's June 2014 classification of Plaintiff's cannabis-abuse disorder as "severe." (LL000131.)

supporting impairment related to musculoskeletal diagnosis," though he expressly declined to "make any comments regarding the headaches and memory issues with reported Traumatic Brain Injury." (LL000324, 331.)  Dr. Burnett's report was somewhat more detailed:  she diagnosed Plaintiff with a "mixed headache syndrome" and with "early movement disorder, unspecified," but found "no evidence of cognitive impairment on a medical basis." (LL000312.)  Dr. Burnett suggested that Plaintiff's headaches are "more consistent with migraine" than with occipital neuralgia; she added that effective treatment of Plaintiff's underlying psychiatric concerns (*e.g.*, depression and anxiety) could aid the treatment of his headaches, and she concluded that, because the occipital nerve blocks have relieved some of Plaintiff's pain, his headaches are "not an impairing condition." (LL000319.)  As for the movement disorder, Dr. Burnett suggested that simple workplace accommodations (such as dictation software and an "appropriate ergonomic environment") could make it possible for Plaintiff to perform the types of computer-related tasks that he completed as a CareFirst auditor. (LL000320.)

On July 14, 2015 (one year after Plaintiff could have first qualified for LTD benefits), Defendant denied Plaintiff's administrative appeal. (*See* LL000393–401.)  Plaintiff filed the present action pursuant to section 502(a)(1)(B) of ERISA on August 27, 2015. (ECF No. 1.) The parties filed cross-motions for summary judgment (ECF Nos. 14 & 19); those motions are ripe for decision.

## II.   *Summary Judgment vs. Bench Trial on the Administrative Record*

When faced with cross-motions for summary judgment, the Court must consider each motion separately on its own merits. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). The Court will grant summary judgment to a party who demonstrates that (1) there is no genuine dispute as to any material fact and (2) that party is entitled to judgment as a matter of law.  Fed.

R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). No genuine issue of material fact exists if the opposing party fails to make a sufficient showing on an essential element of his case as to which he would have the burden of proof. *See Celotex*, 477 U.S. at 322-23. The "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The facts themselves, and the inferences to be drawn therefrom, must be viewed in the light most favorable to the opposing party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008). Even so, the opponent may not rest upon the mere allegations or denials of his pleading but must instead set out specific facts, supported by evidentiary material, showing a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1).

As Judge Hollander of this District recently observed, there is a "divide among the circuit courts of appeal and a void in the Fourth Circuit as to whether [summary judgment] is necessarily the appropriate mechanism to resolve a § 1132(a)(1)(B) ERISA claim for denial of benefits." *Horton v. Life Ins. Co. of N. Am.*, Civ. No. ELH-14-3, 2015 WL 1469196, at *12 (D. Md. Mar. 30, 2015); *cf. Phelps v. C.T. Enters., Inc.*, 394 F.3d 213, 218 (4th Cir. 2005) ("The propriety of importing the summary judgment standard whole-cloth into the ERISA context has . . . received extensive attention . . . . [P]erplexities arise chiefly when courts are reviewing claims for benefits under 29 U.S.C. § 1132(a)(1)(B)."). While courts sitting in this Circuit continue to resolve straightforward ERISA cases on summary judgment, courts alternatively invoke Rule 52 (governing actions tried on the facts without a jury) in cases in which material facts remain in dispute or in which the court must weigh the evidence and make credibility determinations in order to reach a just result. This is so because "at the summary judgment stage

the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Conversely, at a bench trial, the judge sits as finder of fact and is empowered to evaluate the evidence, determine the credibility of witnesses, and draw whatever reasonable inferences the judge deems appropriate given his factual findings. *See Inv'rs Title Ins. Co. v. Bair*, 296 F. App'x 332, 333 (4th Cir. 2008) (per curiam) (citing *United States v. Bales*, 813 F.2d 1289, 1293 (4th Cir 1987)). Although in the ERISA context the court generally limits the scope of its review to the administrative record, *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1025 (4th Cir. 1993) (en banc), such limitation "does not make a bench trial improper," *Stewart v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, Civ. No. WDQ-09-2612, 2012 WL 122362, at *5 (D. Md. Jan. 12, 2012). Rather, "it seems appropriate . . . for a district court to conduct a 'bench trial "on the papers" with the district court acting as the finder of fact.'" *Neumann v. Prudential Ins. Co. of Am.*, 367 F. Supp. 2d 969, 979 (E.D. Va. 2005) (quoting *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003)); *cf. Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999) (en banc) ("The district judge will be asking a different question as he reads the evidence [at trial], not whether there is a genuine issue of material fact, but instead whether [the plaintiff] is disabled within the terms of the policy. . . . [T]rial on the record, even if it consists of no more than the trial judge rereading what he has already read, and making findings of fact and conclusions of law instead of a summary judgment decision, may have real significance.").

### III.   ERISA Analysis

#### A.   Standard and Scope of Review

##### 1.   De Novo *Review as the Appropriate Standard*

In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), the Supreme Court of the United States held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Although *Firestone* established a *de novo* default, the exception quickly swallowed the rule: simply by inserting an unambiguous discretionary clause into a plan document, the administrator could ensure that a reviewing court would employ a highly deferential abuse-of-discretion or arbitrary-and-capricious standard in evaluating a denial of benefits. *See* Maria O'Brien Hylton, *Post-*Firestone *Skirmishes:  The Patient Protection and Affordable Care Act, Discretionary Clauses, and Judicial Review of ERISA Plan Administrator Decisions*, 2 Wm. & Mary Pol'y Rev. 1 (2010).  Critics have long complained that the *Firestone* loophole invited bad-faith benefit denials, allowing plan administrators to "impose self-serving terms that severely restrict the ability of a reviewing court to correct a wrongful benefit denial."  John H. Langbein, *Trust Law as Regulatory Law:  The Unum/Provident Scandal and Judicial Review of Benefit Denials Under ERISA*, 101 Nw. U. L. Rev. 1315, 1316 (2007).

In response to these concerns, state legislatures and insurance regulators have in the recent past enacted statutes, regulations, and administrative rules that either prohibit outright the use of discretionary clauses in insurance contracts or impose limitations on the content and format of these clauses.  *See Davis v. Unum Life Ins. Co. of Am.*, No. 4:14-cv-00640-KGB, 2016 WL 1118258, at *3 (E.D. Ark. Mar. 22, 2016) (noting that, as of 2015, nearly half of the states

had implemented or were in the process of implementing such restrictions).  Many of these legal

reforms derive from a model act promulgated by the National Association of Insurance

Commissioners ("NAIC"), which proposes that no health- or disability-insurance contract may

"contain a provision purporting to reserve discretion to the insurer to interpret the terms of the

contract, or to provide standards of interpretation or review that are inconsistent with the laws of

[the] state."  (ECF No. 22–2 at 1.)  Maryland is among those states that have enacted a law based

roughly on the NAIC model act:  in 2011, the General Assembly enacted H.B. 1085, codified as

Md. Code Ann., Ins. § 12-211.  Subsection (b) of the statute (as enacted) provides as follows:

> A disability insurance policy may not be sold, delivered, or issued for delivery in
> the State by a[n insurer] if the policy contains a clause that purports to reserve
> sole discretion to the [insurer] to interpret the terms of the policy or to provide
> standards of interpretation or review that are inconsistent with the laws of the
> State.

Legislative history sheds light on the General Assembly's intent in enacting section 12-211.[7]

Appearing before the House Health and Government Operations Committee on March 10, 2011,

representatives of the Maryland Insurance Administration testified that discretionary clauses are

prevalent in disability policies; that, if a carrier upholds a denial of benefits, there is "no

opportunity for a court to independently review all the evidence to determine if the carrier's

decision was correct"; and that the proposed law would "give consumers the opportunity for an

independent, impartial review of a denial of a disability claim."  (ECF No. 22–1 at 1-2.)

Similarly, a Fiscal and Policy Note prepared by the Maryland Department of Legislative Services

explains that the Maryland statute is "based on NAIC's model law" and that the "model is

---

[7] *Cf. Mayor & City Council of Balt. v. Chase*, 756 A.2d 987, 993 (Md. 2000) ("[O]ur cases indicate that even when the language of a statute is free from ambiguity, 'in the interest of completeness' we may, and sometimes do, explore the legislative history of the statute under review.  We do so . . . to look at the purpose of the statute and compare the result obtained by use of its plain language with that which results when the purpose of the statute is taken into account.  In other words, the resort to legislative history is a confirmatory process; it is not undertaken to contradict the plain meaning of the statute." (citations omitted)).

intended to help ensure that . . . disability-income protection coverage [is] contractually guaranteed and avoid the conflict of interest that occurs when the carrier responsible for providing benefits has discretionary authority to decide what benefits are due."[8]

Relying on the plain text of section 12-211 and its legislative history, Plaintiff contends that the Court should conduct a *de novo* review of the benefits denial at issue here.[9]  Defendant, not surprisingly, disagrees:  Defendant contends that (1) the language of the Policy "gives [Defendant] sufficient discretion to overcome the presumption of *de novo* review set forth in *Firestone*" and (2) section 12-211 "does not mandate *de novo* review."  (ECF No. 22 at 1.)  In resolving this dispute, the Court finds it helpful to first clarify what Defendant does *not* argue.  Defendant does *not* suggest that section 12-211 is preempted by ERISA, a strategy that insurance companies elsewhere have repeatedly employed with virtually no success.  Indeed, although the Fourth Circuit has not yet entertained the question, each of the three federal appellate courts squarely to do so has concluded that state laws prohibiting discretionary clauses constitute "law[s] of any State which regulate[] insurance" within the meaning of ERISA's savings clause, 29 U.S.C. § 1144(b)(2)(A), and are therefore not preempted.  *See Fontaine v. Metro. Life Ins. Co.*, 800 F.3d 883, 885 (7th Cir. 2015); *Standard Ins. Co. v. Morrison*, 584 F.3d 837, 845 (9th Cir. 2009); *Am. Council of Life Insurers v. Ross*, 558 F.3d 600, 602 (6th Cir. 2009).  This Court finds the reasoning of these appellate courts—and the numerous district courts that have echoed them—persuasive, and it applies that reasoning here.  In so doing, the Court acknowledges the two-part test that state laws must satisfy before they will escape preemption under ERISA, *see*

---

[8] *Cf. Hammonds v. State*, 80 A.3d 698, 712 (Md. 2013) (explaining that Fiscal and Policy Notes can offer an "instructive" glimpse into legislative history).

[9] The parties do not question that Maryland law applies, and for good reason:  the Policy, *see* LL000003, expressly provides that it is both delivered in Maryland and governed by Maryland's laws.  *See Granger v. Life Ins. Co. of N. Am.*, No. 6:14-cv-1820-Orl-41DAB, 2016 WL 2851434, at *9 (M.D. Fla. Mar. 28, 2016) ("Pursuant to federal law, '[w]here a choice of law is made by an ERISA contract, it should be followed, if not unreasonable or fundamentally unfair.'" (alteration in original) (citation omitted)).

*Ky. Ass'n of Health Plans, Inc. v. Miller*, 538 U.S. 329, 342 (2003) ("First, the state law must specifically directed toward entities engaged in insurance. Second . . . the state law must substantially affect the risk pooling arrangement between the insurer and the insured." (citation omitted)). There can be no serious question that a law imposing a particularized limitation on the content of an insurance contract is a law "specifically directed toward entities engaged in insurance": as Judge Hamilton of the Seventh Circuit recently observed, these laws are "grounded in policy concerns specific to the insurance industry," regulating entities with respect to their insurance practices. *Fontaine*, 800 F.3d at 887 (quoting *UNUM Life Ins. Co. of Am. v. Ward*, 526 U.S. 358, 372 (1999)). Nor is there any credible dispute that these laws "substantially affect the risk pooling arrangement": as Judge O'Scannlain of the Ninth Circuit wrote, by "removing the benefit of a deferential standard of review from insurers, it is likely that [these laws] will lead to a greater number of claims being paid. More losses will thus be covered, increasing the benefit of risk pooling for consumers." *Morrison*, 584 F.3d at 845.

Rather than pressing the hopeless preemption argument that courts have roundly rejected, Defendant focuses instead on the Maryland statute's legislative history, arguing that the General Assembly made two "significant" amendments to H.B. 1085 that should inform the Court's interpretation of the statute as enacted. The first such argument is easily dispatched; the second requires more consideration.

Defendant first observes that the original draft of H.B. 1085 contained a provision— subsection (c)—that would have voided contract language that violated the statute's terms. Draft subsection (c) provided that a "clause in a . . . contract that purports to reserve discretion to the carrier to interpret the terms of the . . . contract or to provide standards of interpretation or review is void and unenforceable." (ECF No. 22–3 at 2.) Defendant insinuates (though does not

expressly contend) that, by striking subsection (c), the General Assembly signaled that courts should not read offending language out of insurance contracts.  If true, that would be an odd result indeed:  presumably, it is not the ordinary practice of the General Assembly to enact toothless laws.  But a review of the statutory context sets any doubt to rest.  Section 12-103 provides that an otherwise valid insurance policy "with a condition or provision that does not comply with the requirements of [the Insurance Article] is not invalid but is to be construed and applied in accordance with the condition or provision that would be applicable if the policy . . . were in full compliance with [the] article."  *See also C B Structures, Inc. v. Potomac Elec. Power Co.*, 122 F. Supp. 3d 247, 251 (D. Md. Aug. 13, 2015) ("[A] contract 'is measured by its terms unless a statute, regulation, or public policy is violated thereby.'" (quoting *Connors v. Gov't Emps. Ins. Co.*, 88 A.3d 162, 166 (Md. Ct. Spec. App. 2014), *aff'd*, 113 A.3d 595 (Md. 2015))); *Stickley v. State Farm Fire & Cas. Co.*, 65 A.3d 141, 153 (Md. 2013) ("Although the Court will generally allow parties to contract freely, '[a] clause in an insurance policy, which is contrary to the public policy of this State, as set forth in . . . the Insurance Code or other statute, is invalid and unenforceable.'" (alterations in original) (quoting *State Farm Mut. Auto. Ins. Co. v. Nationwide Mut. Ins. Co.*, 516 A.2d 586, 588 (Md. 1986))).  By eliminating subsection (c) from H.B. 1085, the General Assembly simply struck a superfluous provision.  In the absence of any evidence to the contrary, the Court attaches no further meaning to that amendment.

Next, Defendant points out that, whereas the original draft of H.B. 1085 proscribed contracts that "purport[] to reserve discretion to the carrier to interpret the terms of the policy" (ECF No. 22–3 at 2), the enacted statute proscribes contracts that "purport[] to reserve *sole* discretion to the carrier to interpret the terms of the policy," Md. Code Ann., Ins. § 12-211(b) (emphasis added).  Defendant submits that Maryland insurance policies may continue to feature

"discretionary authority provision[s] so long as the discretion [is] not 'sole.'" (ECF No. 22 at 4.)

Sure enough, while the Policy here includes a general provision that extends "sole discretion" to

Defendant (*see* LL000042), that general provision is trumped by ADOP-ENDORSEMENT-01

(MD) (the "Maryland Endorsement"), which provides that Defendant "shall possess discretion to

*reasonably* construe the terms of this policy and to *reasonably* determine benefit eligibility

hereunder" and that Defendant's decisions "may be subject to judicial review." (LL000048

(emphases added).) Defendant surmises that, through shrewd wordsmithing, it has retained its

administrative discretion and averted the sharp scrutiny of *de novo* review.

Defendant's subtle linguistic argument is superficially attractive, but it fails for several

reasons. First, despite the innocuous "reasonableness" language of the Maryland Endorsement,

Defendant's preferred interpretation would endow it with *de facto* sole discretion—or, more

precisely, with the maximum discretion to which it could possibly be entitled under ERISA.[10]

This is so because only two parties are responsible for the decision to grant or deny benefits—

Defendant and the Court. Defendant does not share its administrative decision-making power

with any third party: it does not, for instance, rely on an independent third-party administrator or

a neutral appeals processor. Instead, Defendant (the insurer/payer) determines whether to

approve or deny claims; if it denies a claim and that denial is administratively appealed, it

transfers the file to its internal Appeals Review Unit. (*See* LL000349.) But all decisions are

ultimately made by Defendant. Were the Court to employ the deferential review that Defendant

seeks, the only question before the Court would be whether Defendant abused its *effectively* sole

discretion.

---

[10] Strictly speaking, there is no such thing as "sole" discretion in any plan governed by ERISA, as all benefits decisions are subject to *some* degree of judicial oversight. For that matter, there is presumably some mechanism for review (either through litigation or arbitration) even for denial decisions relating to insurance policies not governed by ERISA. If the mere possibility of *some* external review, however deferential, removes an insurance policy from the ambit of section 12-211, the Court is forced to wonder what purpose the statute could possibly serve.

Second, and relatedly, Defendant's preferred interpretation would reduce section 12-211 to nothing more than a drafting guide.  Insurer–administrators, who might reasonably be assumed to have no love for *de novo* review, could do exactly what Defendant has done here— replacing a general provision that clearly violates the statute with an endorsement that (ostensibly) passes muster.  And then these insurer–administrators could carry on in precisely the same vein as they have done since *Firestone*, making virtually autonomous decisions subject only to deferential review.  The Court will not bless an interpretation of section 12-211 that guts the statute of its meaning.  *See Kaferly v. Metro. Life Ins. Co.*, Civ. No. 14-cv-3504-WJM-CBS, 2016 WL 3197375, at \*6 (D. Colo. May 31, 2016) ("[T]his Court declines to apply a rule of law that would allow insurers to evade the obvious purpose of [an analogous statute] by means of clever drafting."); *cf. Stone v. Instrumentation Lab. Co.*, 591 F.3d 239, 243 (4th Cir. 2009) ("Courts will not . . . adopt a 'literal' construction of a statute if such interpretation would thwart the statute's obvious purpose or lead to an 'absurd result.'" (quoting *Chesapeake Ranch Water Co. v. Bd. of Comm'rs*, 401 F.3d 274, 280 (4th Cir. 2005))).[11]

Finally, the Court observes that section 12-211 was not enacted in a vacuum:  rather, as Defendant concedes, it was based on the NAIC model act, which aims to close the *Firestone* loophole and guarantee *de novo* review (thereby leveling the playing field for consumers who are otherwise substantially at the mercy of insurer–administrators).  Indeed, as noted above, roughly

---

[11] Through its independent research, the Court discovered *Baker v. Hartford Life Insurance Co.*, Civ. No. 08-cv-6382 (FLW), 2010 WL 2179150 (D.N.J. May 28, 2010), *aff'd*, 440 F. App'x 66 (3d Cir. 2011), a case in which the district court—and the Third Circuit, in an unpublished opinion—suggested that a court need not employ *de novo* review where (1) a state regulation forbids the reservation of sole discretion to the insurer and (2) the contract at issue vests such discretion in the insurer but nevertheless leaves open the possibility of judicial review.  The New Jersey regulation differs somewhat from the Maryland statute, but to the extent that the reasoning in *Baker* could be applied here, the Court finds that reasoning unpersuasive and declines to extend it.  *Cf. Adele E. v. Anthem Blue Cross & Blue Shield*, Civ. No. 2:15-CV-01-DBH, 2016 WL 1732722, at \*6 (D. Me. Apr. 28, 2016) (insurance policy that purported to reserve complete discretion to insurer but that also referenced claimant's right to internal complaint/appeal procedures and external review by state bureau nevertheless violated state statute barring provisions reserving "sole or absolute discretion" to carrier).

half of the states have now implemented laws along the same lines as the model act, and courts have continually upheld these laws, often in the face of contract language that otherwise would require deference. *See, e.g.*, *Curtis v. Metro. Life Ins. Co.*, Civ. No. 3:15-CV-2328-B, 2016 WL 2346739, at \*3 (N.D. Tex. May 4, 2016); *Nagy v. Grp. Long Term Disability Plan*, No. 14-cv-00038-HSG, 2016 WL 1611040, at \*10 (N.D. Cal. Apr. 22, 2016); *Granger v. Life Ins. Co. of N. Am.*, No. 6:14-cv-1820-Orl-41DAB, 2016 WL 2851434, at \*10 (M.D. Fla. Mar. 28, 2016); *Snyder v. Unum Life Ins. Co. of Am.*, No. CV 13-07522 BRO (RZx), 2014 WL 7734715, at \*11 (C.D. Cal. Oct. 28, 2014); *Novak v. Life Ins. Co. of N. Am.*, 956 F. Supp. 2d 900, 911 (N.D. Ill. 2013); *Franks v. Unum Life Ins. Co. of Am.*, No. 1:12-CV-166, 2013 WL 449566, at \*5 (W.D. Mich. Feb. 6, 2013); *Gray v. Mut. of Omaha Life Ins. Co.*, No. 11-15016, 2012 WL 2995469, at \*4 (E.D. Mich. July 23, 2012). Without a clearer signal that the General Assembly intended its derivative of the model act to have a contrary (and largely nugatory) effect, the Court declines to swim against the tide of prevailing authority.

For these reasons, the Court will conduct a *de novo* review of Defendant's denial decision (both in this Memorandum and in further proceedings, as discussed below).

### 2. Contours of De Novo Review

Before turning to the facts of this case, the Court briefly addresses the nature and scope of *de novo* review in the ERISA context. When reviewing a benefits denial *de novo*, the Court's "job is to make [its] own independent determination of whether [the claimant] was entitled to the . . . benefits. The correctness, not the reasonableness, of [the] denial of . . . benefits is [the Court's] only concern . . . ." *Johnson v. Am. United Life Ins. Co.*, 716 F.3d 813, 819 (4th Cir. 2013); *see also Gluth v. Fed. Home Loan Mortg. Corp. Long-Term Disability Plan*, Civ. No. 1:11-cv-1126, 2013 WL 246897, at \*4 (E.D. Va. Jan. 17, 2013) ("The *de novo* standard of

review allows the court to examine all of the evidence in the record and decide whether or not the Plaintiff is totally disabled without giving any deference to the plan administrator's decision to deny or terminate disability benefits."), *aff'd*, 548 F. App'x 73 (4th Cir. 2013) (mem.). Additionally, while the Court may exercise its discretion to consider evidence beyond the four corners of the administrative record, it should do so only "when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision." *Quesinberry*, 987 F.2d at 1025; *see also Donnell v. Metro. Life Ins. Co.*, 165 F. App'x 288, 297 (4th Cir. 2006) ("[E]ven in ERISA actions in which courts review the administrator's decision de novo, introduction of evidence outside the administrative record is permitted only in exceptional circumstances.").

Where, as here, an ERISA policy makes payment of benefits contingent on the insured's submission of proof of disability (*see* LL000023), courts have found that such "policy language . . . shifts the burden of proof to the insured." *Cossio v. Life Ins. Co. of N. Am.*, 240 F. Supp. 2d 388, 392 n.2 (D. Md. 2002); *accord Band v. Paul Revere Life Ins. Co.*, 14 F. App'x 210, 212 (4th Cir. 2001) (per curiam); *Realmuto v. Life Ins. Co. of N. Am.*, Civ. No. GLR-14-1386, 2015 WL 4528182, at *4 (D. Md. July 24, 2015). Accordingly, the burden rests on Plaintiff to prove that he is (or was) disabled within the meaning of the Policy. Even at the summary-judgment stage, it is appropriate for the Court to "view the evidence presented through the prism of the substantive evidentiary burden," *Anderson*, 477 U.S. at 254, and the Court will do so here.

### B.   Application

Having determined that it will conduct a *de novo* review of Defendant's denial decision, the Court next turns its attention to the administrative record and, specifically, to the evidence both supporting and undercutting Plaintiff's claim for LTD benefits. As explained below, the record is

far from clear:  to reach an appropriate outcome, the Court must resolve questions of material fact, assess expert credibility, and—most critically—weigh the evidence.  Yet such analytical exercises are more properly conducted in a trial posture than at the summary-judgment stage.

In reviewing the record, the Court finds it helpful to organize Plaintiff's health concerns into three general categories:  psychiatric and behavioral concerns; cognitive and neuropsychological concerns; and neurological concerns.

With respect to Plaintiff's psychiatric and behavioral concerns, the record is mixed. Though Dr. Lauterbach diagnosed Plaintiff with an unspecified mood disorder and, later, with other specified bipolar and related disorder (LL000131, 144), Dr. Testa considered bipolar a "remote diagnostic possibility" (LL000162), and Dr. Sugerman opined that the mood-disorder diagnoses are not well-established (LL000288).  Likewise, while Plaintiff scored at or above the 99th percentile for anxiety, depression, and schizophrenia on Dr. Testa's personality assessment inventory (LL000161), Dr. McManus suggested that such scores are indicative of either exaggeration or non-credible reporting (LL000286).[12]   And while Plaintiff consistently complained to his various treatment providers about his depression and anxiety, he also refused Dr. Lauterbach's admonition that he pursue counseling (LL000129, 557).   As Defendant correctly observes in its reply brief (ECF No. 22 at 15), to recover LTD benefits, Plaintiff must prove not only that he is disabled within the meaning of the Policy but also that he has pursued "Appropriate Available Treatment," defined as care (1) generally acknowledged by physicians to treat a disabling condition; (2) accessible within his geographical region; (3) provided by a licensed and qualified physician; and (4) compatible with generally accepted medical standards

---

[12] Dr. Testa apparently drew a different conclusion, writing that Plaintiff's scores "suggest that he attended appropriately to item content and responded in a consistent fashion to similar items," answering questions in a "reasonably forthright manner" without attempting to present an "unrealistic or inaccurate impression that was either more negative or more positive than the clinical picture would warrant."  (LL000161.)

(LL000009).  Plaintiff's refusal to follow Dr. Lauterbach's recommendation would seem to cut against his claim for LTD benefits, at least to the extent that such claim arises from his depression/anxiety and related symptoms.

With respect to Plaintiff's cognitive and neuropsychological concerns, the record is again mixed.  Dr. Testa found that, while Plaintiff has an above-average IQ, his processing speed is notably diminished (LL000162)—presumably a problematic finding for a former auditor who performed quality-control tasks in a "fast paced environment with frequently changing priorities, deadlines, and workloads" (LL000342).[13]  Yet Dr. Crutchfield opined that most of Plaintiff's "cognitive and attention difficulties could be explained by his depression" (LL000196), and Dr. McManus more firmly concluded that the record lacked sufficient evidence of a psychological or neuropsychological impairment that would prevent Plaintiff from performing his material duties (LL000285).  In fact, as discussed below, both Plaintiff's treating physicians *and* Defendant's peer reviewers seem to agree that Plaintiff's cognitive symptoms may be attributable, at least in part, to his abuse of cannabis products—though, as further explained below, such a finding (if true) would not necessarily bar Plaintiff from all recovery.

By contrast, Plaintiff's neurological concerns find ample support in the record.  Beginning in January 2014 and continuing through the close of the record, Plaintiff consistently reported recurring (sometimes daily) headaches, which he described as "aching, throbbing, sharp, dull, shooting and burning" (LL000615).  Plaintiff's consistent complaints, though obviously somewhat subjective, are nevertheless germane to the Court's *de novo* review:  as the

---

[13] Defendant posits that the Court should evaluate Plaintiff's disability claim in light of his ability to perform his *occupation*, not his particular job at CareFirst.  (ECF No. 22 at 17 & n.4.)  Defendant is certainly correct that the Policy defines "Own Occupation" to broadly encompass the insured's "employment, business, trade or profession" (LL000014)—but the only evidence in the administrative record corresponding to Plaintiff's occupational responsibilities is his CareFirst job description.  The Court is obviously not in a position to speculate as to possible jobs that Plaintiff *might* be capable of doing; the onus was on the parties to build a complete administrative record (or to append relevant evidence to their summary-judgment papers along with an explanation for why such evidence was not considered during the underlying proceedings).

Fourth Circuit indicated in *Cosey v. Prudential Insurance Co. of America*, 735 F.3d 161, 171 (4th Cir. 2013), where an ERISA-governed plan does not expressly require the claimant to submit objective evidence of a medical condition, subjective reports of pain may constitute relevant proof of disability.  Moreover, the Court need not rely solely on Plaintiff's subjective complaints, because at least two doctors identified occipital nerve injury as a cause or contributing factor to Plaintiff's headaches (*see* LL000113, 612).  For that matter, in its letter upholding its denial decision, Defendant itself admitted that—while it stood by the conclusions of Drs. McManus and Sugerman with respect to Plaintiff's alleged cognitive and behavioral deficits—[w]ith regard to additional complaints of headaches and neck pain . . . [his] restrictions and limitations are unclear."  (LL000399.)    While Plaintiff's pain apparently decreased somewhat after he began receiving occipital nerve blocks, there is no indication that these injections provided Plaintiff with any lasting or reliable relief.  On the contrary, on December 29, 2014, Plaintiff informed Dr. Gunawardane that he had experienced relief for about two weeks following his most recent injection but that his pain had returned, presenting as "7/10 on a numeric scale."  (LL000615.)  And Dr. Lauterbach's final progress note, dated May 4, 2015, indicates that Plaintiff's headaches were ongoing and his pain issues intermittent.  (LL000582–85.)  Further, Plaintiff's neurological concerns are not limited to his headaches.  Dr. Keys identified MRI data consistent with early multiple system atrophy,[14] and he noted signs and symptoms of a potentially related movement disorder affecting Plaintiff's motor skills and sense of balance.  (LL000600.)  Defendant's peer reviewer, Dr. Burnett, agreed that Plaintiff showed

---

[14] However, according to Dr. James Winthrop of Advanced Radiology, Plaintiff's 2014 MRI data is similar to data collected in 2006 (LL000595), which tends to undercut Plaintiff's theory that his condition has worsened in the recent past.  Dr. Winthrop reported "mild cerebellar vermian atrophy and very mild cerebral atrophy" with no definite brainstem atrophy and no hummingbird sign.  (*Id.*)

signs of such an early movement disorder beginning in November 2014, though she felt that any related limitations could be accommodated in the workplace. (LL000320–21.)

In light of the foregoing, while Plaintiff presents a mixed case with respect to his psychiatric and cognitive concerns, his neurological concerns seem well-founded. Indeed, if Plaintiff were entitled to LTD benefits simply because he suffers (or has suffered) from a medical impairment, the Court could likely end its analysis here and resolve the case in Plaintiff's favor. Unfortunately for Plaintiff, his case is more complicated because of the Policy's definition of "Disability." To qualify for LTD benefits, Plaintiff must have been unable to perform the material and substantial duties of his own occupation for the entire elimination period and for twenty-four months thereafter. (LL000010.) Thus, if Plaintiff was not disabled for some period of time (however fleeting) between January 15, 2014, and July 14, 2014, he would be entitled to no LTD benefits; if his disability terminated at some point after July 14, 2014, his LTD benefits would simultaneously terminate.

While the administrative record contains ample documentation of Plaintiff's various ailments, much of that documentation postdates the elimination period, and relatively little documentation is addressed in any meaningful way to Plaintiff's particular job requirements. Plaintiff's primary-care physician, Dr. Falguni Parikh, executed a January 22, 2014, "Attending Physician Statement of Work Capacity and Impairment" in which he indicated that Plaintiff would be totally impaired from working until at least April 2014 (LL000274–77), but it is unclear whether Dr. Parikh considered Plaintiff's job requirements and duties in making this recommendation. PA Rivenburgh signed an "ADA Leave Request Form" indicating that Plaintiff required three to six months of leave beginning in June 2014 (LL000217–22): Plaintiff's job description is appended to this form, but it is again unclear whether PA

Rivenburgh reviewed Plaintiff's duties, as his remarks on the form are quite concise and conclusory in nature. In a September 18, 2014, letter drafted by Dr. Sugerman but approved by Dr. Crutchfield, Dr. Crutchfield acknowledged that Plaintiff's headaches and photophobia affected his ability to perform computer-related tasks, though he "could not define any cognitive impairment." (LL000300–04.) Then, in March 2015, Manish Singh of Physiotherapy Associates opined that Plaintiff would be unable to sustain a full-time schedule, but Singh did not indicate whether Plaintiff could work part-time: moreover, Singh's report focused mainly on physical tasks that fall outside the scope of Plaintiff's primary occupational duties. (LL000446–52.) For that matter, Singh indicated that Plaintiff's ability to sit was *not* affected by his impairment (LL000449), though he also noted that Plaintiff would require increased time to complete fine-motor tasks (LL000451), presumably including keyboarding and computer operations. Finally, Dr. Lauterbach drafted a letter dated May 6, 2015, in which she opined that Plaintiff had been unable to perform his occupational duties since February 2014; however, she also noted that she and Plaintiff "crafted [the letter's] contents together" (LL000580), raising questions about its evidentiary value. Cumulatively, then, the evidence corresponding to the particularized impact of Plaintiff's medical conditions on his ability to perform his material and substantial duties is tenuous.

That said, the Court is reluctant to discount the opinions of Plaintiff's treatment providers (at least at the summary-judgment stage), however conclusory those opinions might seem, given that Defendant ordered no independent medical evaluation but relied instead on paper reviews conducted by physicians working on contract for Defendant. While the Supreme Court has forbidden district courts from requiring ERISA plan administrators "automatically to accord special weight to the opinions of a claimant's physician," the Court has also cautioned that plan

administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).  Further, courts in this Circuit have recognized that "[a]lthough independent reviews of medical evidence and independent examinations of claimants are not required, both are common in ERISA cases.  They can prove especially significant in cases in which the plan administrator is operating under a conflict of interest or rejects a treating doctor's opinion . . . ." *Laser v. Provident Life & Accident Ins. Co.*, 211 F. Supp. 2d 645, 650 (D. Md. 2002) (citation omitted); *see also Neumann*, 367 F. Supp. 2d at 990 ("[E]xamining experts may be more persuasive than those that merely review a paper record. . . . Put simply, a plan administrator . . . must credit the opinion of a treating physician if that physician does a better job."); *Hines v. Unum Life Ins. Co. of Am.*, 110 F. Supp. 2d 458, 467 (W.D. Va. 2000) ("[T]his court simply cannot accept the opinion of [the insurer's] own physicians, based solely upon an examination of the paper record, over that of [the plaintiff's] treating physician . . . ."); *cf. Tortora v. Hartford Life & Accident Ins. Co.*, C.A. No. 6:15-2471-HMH, 2016 WL 462431, at *8 (D.S.C. Feb. 8, 2016) ("Numerous . . . district courts have found a failure to pursue an [independent medical evaluation] is a factor weighing in favor of finding an abuse of discretion.").  Thus, while Plaintiff's position in this litigation would be appreciably stronger had he adduced more (and better) evidence corresponding to the impact of his declining health on his vocational abilities, the Court is not prepared to rule against Plaintiff at this stage.  Rather, the Court, sitting as finder of fact at a forthcoming bench trial on the record, will consider the totality of the evidence and will draw from that evidence whatever reasonable inferences it deems appropriate.

One final point bears consideration.  In its brief in support of its summary-judgment motion, Defendant characterizes Plaintiff as a "faker whose problems, to the extent that they are

real, are the result of his unwillingness to stop smoking marijuana or seek other treatment."
(ECF No. 14–1 at 8.)  In its reply brief, Defendant reiterates that "to the extent that [Plaintiff]
had any cognitive issues, they likely were the result of his incessant use of marijuana . . . and his
unwillingness to participate in therapy."  (ECF No. 22 at 15.)  The Court has already addressed
Plaintiff's reticence toward therapy, a factor it will certainly consider in its final analysis.  As for
Plaintiff's cannabis use, the record strongly suggests that he is dependent on—if not outright
addicted to—the substance.   Dr. Lauterbach's progress notes indicate that she repeatedly
addressed Plaintiff's cannabis use and encouraged him to avoid the substance but that he refused
to comply with her directives (*see* LL000120–52, 559–78); she eventually diagnosed Plaintiff
with "Cannabis use disorder, Severe" (LL000131).   Defendant's peer reviewers also discussed
Plaintiff's drug use:  Dr. McManus wrote that Plaintiff's "neuropsychological test results on
measures of processing speed and attention would be regarded as potentially consistent with his
cannabis abuse" (LL000287), while Dr. Sugerman suggested that Plaintiff's refusal to heed Dr.
Lauterbach's advice "supports overuse of this illicit substance and an *inability to stop*"
(LL000288 (emphasis added)).[15]   While the Court declines to determine at this stage whether or
to what extent Plaintiff's cannabis abuse contributed to his disability (if any) within the meaning
of the Policy, the Court notes that the Policy contemplates disability arising from substance
abuse, *i.e.*, "alcohol and / or drug abuse, addiction or dependency" (LL000017).   Specifically, the
Policy provides that the "benefit for Disability due to . . . Substance Abuse will not exceed a
combined period of 24 months of Monthly Benefit payments while the Covered Person is insured
under this policy."  (LL000026.)  In other words, LTD claimants with substance-abuse problems

---

[15] Dr. Sugerman added that "[i]mpairment related to marijuana is not supported, as the temporary effects of this
substance that might impact functioning is [*sic*] a result of the claimant's choice of action rather than an illness he
cannot control."  (LL000289.)  It is unclear how Dr. Sugerman arrived at the conclusion that Plaintiff's cannabis use
arises from "choice of action" rather than chemical dependency or addiction.

may be entitled to a smaller payout, but they are not necessarily barred from recovering benefits altogether.   It does not appear that Defendant ever seriously evaluated Plaintiff's cannabis addiction as an independent basis for his disability claim, but as the Court is reviewing the record *de novo*, the Court will consider that possibility along with all other possibilities discussed above.

## IV.   Conclusion

Because this case is not amenable to summary judgment, the Court concludes that it must instead sit as finder of fact at a bench trial.   During such trial, the Court will limit the scope of its review—as it has done here—to the contents of the administrative record, which the Court deems sufficiently comprehensive to provide an adequate factual basis for reasoned judgment. As such, there will be no need for testimony or other evidentiary proffer.   However, the Court will direct the parties to submit proposed findings of fact accompanied by appropriate citations to the record, as well as proposed conclusions of law to the extent such conclusions are consistent with the analysis in this Memorandum.   The Court also will allocate time for the parties to present oral argument if they wish.   Should the parties avail themselves of this opportunity, they should organize their presentations much as the Court has done in this Memorandum, discussing the evidence (or lack thereof) corresponding, in turn, to Plaintiff's psychiatric/behavioral, cognitive/neuropsychological, and neurological concerns.   The parties should heed the Policy's definition of disability and should therefore focus on the extent to which the record does (or does not) support Plaintiff's contention that he was unable, during the relevant period, to perform the material and substantial duties of his occupation.

Before the Court schedules any further proceedings, however, the parties may wish to reconsider their respective positions with an eye toward possible settlement.   Accordingly, the Court will grant the parties fourteen days from entry of this Memorandum and accompanying

Order to request a referral to a United States Magistrate Judge for a settlement conference. Should the parties make such a request, the Court will postpone further scheduling; should they decline, the Court will thereafter forthwith set in dates and deadlines for a bench trial.

Finally, the Court observes that this Memorandum contains substantial medical information that Plaintiff might deem confidential or otherwise sensitive.  However, the Court also notes that the parties filed their summary-judgment briefs on an open record.  Given the significant legal issues that the Court addresses herein, the Court is disinclined to permanently seal this Memorandum.  However, the Court remains open to the possibility of redacting certain content, should the parties so request.  Accordingly, the Court will place this Memorandum and accompanying Order under temporary seal and will grant the parties fourteen days to advise the Court (with appropriate supporting explanation and authority) whether they request any particular redactions.  If the parties decline to request redactions, the Court anticipates that it will thereafter direct the Clerk to unseal the files and make them available for publication on the Court's website and in the *Federal Supplement*.

For the reasons stated herein, the pending summary-judgment motions (ECF Nos. 14 & 19) will be DENIED.

DATED this 28th day of June, 2016.

BY THE COURT:

_____/s/_____
James K. Bredar
United States District Judge